Welcome, congratulations. I'm running first motion, one for one. Mr. Mattingly. There are three issues I hope to talk to the court about. Can I ask you a preliminary question? Certainly. Is he receiving any benefits now, do you know? Yes, he is currently in pay status. Okay. And it's my understanding the Department of Labor is his main investment. Okay. That's the way these cases work on appellate procedures. The operators refuse to pay any benefits pending the resolution of the appeal. The third issue I'd like to discuss today, the ALJ's resolution of the causation of this man's partially reversible obstructive airways disease, whether the ALJ has actually resolved the scientific controversy which was presented to him at one time in a complete formulary evaluation question. There's a few things that aren't an issue. Mr. Cush was a long-time coal miner who worked for 33 years as an underground and aboveground miner. He was also a long-time cigarette smoker, smoked somewhere around 30 years a package to a package and a half a day. It's also not disputed he has a partially reversible obstructive airways disease that is of sufficient severity that he could never go back to do his work as a coal miner. So is he entitled to black lung benefits? That's what he's asking my client to pay him. It's clear also that he does not have clinical coal worker's pneumoconiosis, the usual form of the disease that shows up as spots on an x-ray. So he is attempting to prevail by proving legal pneumoconiosis, which is any other airways disease caused by the exposure to coal mine dust. We've got five physicians who've offered opinions in this case. Four of them say, I think he has some asthma. Three of them say he's not been real religious in his medications. That may contribute to the development of his asthmatic condition. The finding of the asthma, would you elaborate on that? It's my understanding that that was a development much, much later in his work life. Well, it's unclear from this record when his symptoms of asthma first started to produce. There's no question that in many of the physicians' minds, everyone except Dr. Parker's opinion, this man has asthma because his ventilatory studies show, on the administration of bronchodilator drugs, that he gets better air out of his lungs. The presence of asthma doesn't by itself exclude him from benefits. No, but as Dr. Rasmussen explained, as Dr. Selkow and Dr. Rinn and Dr. Feener all explained, asthma's not caused by coal mine dust, and there's no reason to believe that if he does have asthma today, it's any longer aggravated by coal mine dust, because he hasn't worked in the mines for such a long time. I understand your arguments with respect to each of the doctors and the waiting hall. You've got to remember, there's a standard of review here, and you've got a little bit of an uphill battle. I do, and I'm not asking this court to re-weigh the evidence. This court's book, I think rather eloquently, in the Barron Creek v. Whitmer decision, it says an administrative law judge has to give a clear and satisfactory explanation of what he did and why he did it. That was recently picked up by the Tenth Circuit in Gunderson v. United States Department of Labor, and the Tenth Circuit's decision explained the APA requires that the ALJ give a meaningful review of all the evidence and resolve the scientific disputes. Here, Dr. Parker says, I think this man has subjective evidence of legal pneumoconiosis, yet when I cross-examined him, none of the medical articles that he relied on supported the inferences that he made in this case. It's apparent when you look at the entirety of his deposition, he's concluded this man has legal pneumoconiosis because he worked as a coal miner. His articles that he cited stood for the proposition that coal mine dust can cause obstructive lung disease, yet when he went through and teased out each of those articles, they showed that there was not this severe obstructive lung disease. They showed that you didn't see a reversible or a partially reversible obstructive lung disease. Apart from the articles, the doctor did examine the patient, didn't he? He did. And asked him questions about his work-life experience, and based on that, in the examination, came to a medical decision. He did, and that's one of the weaknesses in Judge Leland's decision. You're emphasizing articles about this illness, but I'm wondering how important those articles are when you do an actual examination of the patient. The actual examination of the patient. Which includes a history. It included a history. However, his history wasn't correct. He thought this man had never used breathing protection. He thought this man had extreme dust exposure as an above-ground miner, and as Mr. Cooch testified at the hearing, his above-ground experience was really pretty decent. His clothes weren't that dirty. Dr. Parker didn't understand that he used breathing protection. He also testified that the breathing protection was so deficient that he had to keep changing the pads because they were always black, so that it was like an antiquated breathing protection device that he was using. I think that that's an accurate representation of what he said, but that black never got into his lungs when he changed out the dust filters. How do you know that? If the pads were black when he had to replace them, doesn't that suggest, could you not infer that indeed coal dust got into his lungs? You can't infer it from a clinical standpoint because he doesn't have the little spots in the x-rays. That is the typical manifestation of the disease. And he has three different potential causes. Dr. Rasmussen and Dr. Selko, upon whom the ALJ relies as substantial evidence, really aren't reliable evidence because what they've said is there's three possible causes here. I don't know which caused it. I'm either going to give the benefit of the doubt to the coal miner, or I'm just going to assume because he worked as a coal miner that part of it has to be due to coal dust exposure. I think that's when you rely on the doctor's testimony and hear the doctor's reports when they arrive at a decision with reasonable medical certainty. So they go ahead and evaluate all the possible causes, and they come out with the decision that the significant cause was coal dust. And that's what the ALJ is supposed to do. The ALJ, according to the APA, has to explain to us why he reached that decision in this case. And in this case, his decision doesn't do that. Well, it does. You just don't agree with it. No, what he does is he says the positions upon which consolidation and coal company relies are quasi-hostile. They take too narrow a definition. Or they don't believe that this is a disease which may be progressive and latent. Well, on the other hand, you have to be even-handed when you weigh the evidence. The other physicians are too accommodating to the act. They're not requiring that there really be a cause and effect nexus between this man's employment and his obstructive lung disease that they're seeing years after the employment ceased. But they're presuming, based on nothing more than employment in a coal mine, that this man's obstructive impairment was due to that. When it just doesn't fit those patterns, it's partially reversible. It shows a decrease in the ratios, classic for smoking. But as the articles say that Dr. Parker relied on not-seeming coal dust exposure, the ALJ sidestepped those issues. That's my problem with the ALJ. But Parker did take into account all the other possible causes. Did he in this report? I mean, asthma, smoking? Dr. Parker denied asthma. He said that this was not an asthma condition. But he was aware of the suggestion of asthma. He was at the deposition. I asked him about it. He said, no, I don't think this is an asthmatic condition. Let me step to the other issue in this case, which is the complete pulmonary evaluation. Black lung cases are tried in such a manner that the Office of Workers' Compensation Programs, at the miner's request, sends the miner out for a physical examination. Is this the Dr. Bashida issue? This is the Dr. Bashida issue. Dr. Bashida was picked. There's three conclusions a doctor can make on these cases. He can conclude the miner has pneumoconiosis, the miner doesn't have pneumoconiosis. Well, I can't make a decision. Wait, can you move things along? I mean, doesn't the ALJ have discretion to, if he feels it's incomplete, to roll up an entirely new, I guess, examination? When you look at 725.456, it says that the ALJ has to do such additional evidence as required. And there was a question as to whether a deposition of Dr. Bashida would help flush out his opinion. I wouldn't agree to it at the time, because the record hasn't been existed. Support my client's position. There wasn't sufficient evidence to establish a time limit for benefits. My client was entitled to a summary decision at that point. I thought the problem was that the report was simply not complete, and the ALJ wanted a little more completeness, a little bit more information, and requested it, but Dr. Bashida was fairly nonresponsive. No, the ALJ never requested it. The ALJ has the power to issue a subpoena. The ALJ could have had Dr. Bashida show up at the hearing, could have issued a subpoena. We could have taken his deposition. Isn't this all his discretion, though? He could have done something, and he didn't do it. It's still his discretion to say, I just want a totally new one from a new guy. He took the most extreme possibility to blow out the doctor's opinion. Why was it so extreme that it's an abusive discretion? In this case, I believe it was because we went to another handpick expert by the claimants' counsel who he thought from past experience would give him a better opinion than the first position that was picked out by the claimant for the evaluation. With that, I will wait to move on. Thank you very much. Ms. Strach? Good afternoon to the court. My name is Amanda Strach, and I represent the respondent, Mr. William Kirsch. I'd like to start by jumping right into that first issue that the coal company began with because with that issue, they are attempting to re-litigate Mr. Kirsch's claim. What Mr. Manningly is asking this court to do is to step below the level of the administrative law judge and re-weigh that evidence in discussing the studies that Dr. Parker relied on. And we have a standard of review, right? Yes, Your Honor, and that standard is that Judge Leland's decision must be upheld as rational if it is supported by substantial evidence, which is defined as more than a mere scintilla. And the fact is, Judge Leland's decision is supported by an abundance of evidence. Judge Leland weighed all the medical evidence. He also relied on reports that didn't contain all the necessary information. Mr. Manningly brought up, for example, that Mr. Kirsch had worked in underground for 15 years, but he was using a respirator, and that he worked above ground for about 10 years in a closed environment. That was not necessarily factored in by the doctors who gave the ALJ reports. Correct, Your Honor, but that is not a significant conflict in the record. The two experts in this case that mentioned Mr. Kirsch's use of the respirator did not place significance on it. So Judge Leland rightfully did not focus on the use of the respirator. Of those two experts, Dr. Fino mentioned it twice. The first time, on page 654 of the Joint Appendix, in which Dr. Fino states, if we dissect out Mr. Kirsch's above ground employment, if we dissect out his use of the respirator, he could still have a coal dust-related condition. Now Dr. Fino went on to say that could he have a clinically significant lung disease based on his symptoms in 1998? No. And based on that testimony, it's clear that Dr. Fino's opinion rests on the fact that Mr. Kirsch had symptoms arising in 1998, not his use of the respirator. The second time Dr. Fino mentions it, on page 684 of the Joint Appendix, he states, he simply acknowledges that the respirators are not perfect. And as Your Honor pointed out, Mr. Kirsch did explain at his hearing that the respirator was of the old type, that he only wore it for 10 of the 15 years on the ground. Of those 10 years, when he worked as a roof bolter, he only used it 50% of the time. He was a very heavy smoker during this period. Was it a pack and a half a day? Yes, Your Honor. And the three claimants' experts took that into account in their analysis, in their conclusion that Mr. Kirsch has COPD with a possible asthmatic component caused by coal mine dust and smoking. Now Dr. Selko notes on page 327 of the Joint Appendix that it is significant to look at when Mr. Kirsch retired from the coal mines versus when he quit smoking. Now Dr. Fino really clarifies that statement on pages 642 and 644 of the Joint Appendix. Dr. Fino explains that if Mr. Kirsch is going to have a smoking-related condition, it's going to be there when he quit. Mr. Kirsch quit smoking in 1993. He did not start having symptoms until 1998, five years after he quit smoking, five years of which he was still working the coal mines. And once Mr. Kirsch had symptoms starting in 1998, by 2000 he was forced to retire from the coal mines based on his pulmonary symptoms. Claimants' experts took that into account in combination with Mr. Kirsch's objective test. The fact that from 2001 to 2005, Mr. Kirsch's lung disease was getting progressively worse. And they took that in combination with the fact that Mr. Kirsch did spend 15 years underground, five years prior to the enactment of dust regulations, followed by 20 years above ground. All of this together, looking at how long he worked in the coal mines and when he quit. Any of the doctors that testified and gave reports treating physicians, are they all examining physicians? Did he have his own doctor throughout this period that talked about his history? No, Your Honor, but medical records were submitted as part of the medical evidence in this case. In other words, the doctors that gave an opinion, a medical opinion of his illness, took into account the opinions or the treating records of his treating physicians. Yes, Your Honor, and that is reflected specifically in Dr. Parker's testimony. Let me clarify, excuse me, Dr. Selko's testimony. Because in Dr. Selko's testimony, he explains that if Mr. Kirsch were to have, as the coal company experts suggest, adult onset asthma and airway remodeling from asthma. If Mr. Kirsch were to have this severe form of asthma, such that it caused airway remodeling and severe pulmonary function tests, that his medical records would have documentation for repeated visits to the emergency room or the hospital for acute asthmatic events. And the record reflects that he had no such visits. So they took that into account with his coal mine employment history, his smoking history, and the objective tests. All of this was enough to amount to more than a mere scintilla. Can I change your focus a little bit? More to causation, specifically, what's wrong with the Anderson case? Why shouldn't we follow that? For two reasons, Your Honor. The coal company relies on Anderson to support the proposition that the 203B presumption does not apply to legal pneumokinosis. But first, Anderson is distinguishable from Mr. Kirsch's case. In Anderson, the plaintiff, Mr. Anderson, proved that he has COPD. But he failed to prove that his COPD arose out of his coal mine employment, which is an element of the 203B presumption. Thus, according to the Tenth Circuit, Mr. Anderson was not entitled to the 203B presumption. This is different from Mr. Kirsch's case because Mr. Kirsch established that he has COPD and that his COPD arose out of his coal mine employment. If we were to say that the doctor's reports are fluid because they were unaware that he, Kirsch, was using a respirator for a number of years and that he was using a cab while working above ground, should we remand this case for those doctors to factor that in their reports? No, Your Honor. It would be entirely improper to remand this case on an issue that was not a conflict in the record. I didn't think you would agree with that. To hear your reason. And the record reflects, as I stated, of the total 140 pages of testimony from Drs. Wren and Pena, the two experts who knew and mentioned Mr. Kirsch's use of a respirator, they spent a total of three sentences discussing the respirator and all of their testimony. So it would be entirely improper to send this case back down on an issue that was not a significant fact in the record. As I said, all Judge Zwielan needed was more than a mere scintilla, but he had far more than that. He based his decision on such relevant evidence as a reasonable mind could accept as adequate to support the conclusion that Mr. Kirsch has legal pneumoconiosis. Now, in turning to that presumption issue, Judge Zwielan did not simply apply a presumption that because Mr. Kirsch worked in the coal mines, that it arose out of his coal mine employment. The first eight pages of his opinion are dedicated to weighing all the medical evidence and concluding that the client's experts provided a more convincing and better reasoned, better documented opinions to support the finding that Mr. Kirsch's COPD arose out of his coal mine employment. Because Judge Zwielan made that independent finding in discussing element one independent of the application of the 203B presumption, that application in this case doesn't matter. Even if this court were to find that the application was improper, it would be harmless. Because Judge Zwielan found that Mr. Kirsch's lung disease arose out of his coal mine employment, and that was independent of the application of any presumption. However, we would still argue, Your Honor, that the presumption... Your Honor, I'm sorry, but to speak to that, can you point to something specific that the decision had found? Yes, Your Honor, if you look at the first eight pages, and specifically Judge Zwielan concludes on page 10A of the joint appendix, that Drs. Parker, Selko, and Rasmussen have provided well-reasoned, well-documented reports indicating that the minor sufferers from COPD and an asthmatic component caused or exacerbated by coal mine dust and smoking. When you go to the end of that paragraph, I find the opinions of Drs. Selko, Parker, and Rasmussen to be supported by the objective evidence in the medical literature, as opposed to the contrary opinions of Dr. Ren and Finan, who do not account for the irreversible component of the minor's pulmonary impairment. After reading all the evidence, I find that the minor has established that he has legal limb hemorrhosis. And this is based on Judge Zwielan going through all five extra reports and all five of their individual testimony and weighing that. So the presumption doesn't even come into play. You mean his specific finding of causation? Essentially, Your Honor, when he turned to element 2 at the bottom of page 10A, he could have said, see above, or he could have reiterated that entire analysis. But instead, he chose to apply the 2.3b presumption, which was entirely proper in this case. Was the presumption necessary? No, Your Honor. It was not necessary. But it is still proper, based on the language of the regulation and the act. Okay. Ms. Drieck, thank you very much for your argument. Mr. Manning, can I ask one more question? Sure. Just to confirm, was there any misrepresentation of your client receiving benefits? Yes, Your Honor. Great. Thank you. Mr. Manning, whoops, whoops, I skipped you. Dr. Hall, I'm Jeff Goldberg for the Government, Your Honor. Mr. Goldberg. I will be talking about the pulmonary evaluation from Dr. Bushida and the ALJ's treatment of it. Very simply, the government is charged with providing the minor a complete pulmonary evaluation. Dr. Bushida's report is not complete. He did not address whether the minor has pneumoconiosis. I thought I had mentioned that before. It seemed that that was the reason why it was sent back, or he was asked to complete his report. And he was, and Dr. Bushida failed again. But that was the reason for sending it back. It was sent back to him. The district director sent it back, or asked Dr. Bushida. He sent him a list of questions. He did not respond. He responded, but not helpfully. With the same vague and equivocal language essential that he used in his first opinion. So was the ALJ at his discretion to come up with something new for examination? Absolutely. The ALJ had no expectation at that point that turning it to Dr. Bushida would do any good. He did two bites at the apple and failed at both of them. Additionally, section 456E requires that the ALJ shall, in his or her discretion, rename the claim to the district director with instructions to develop only such additional evidence as is required. The ALJ, within his discretion, found it was required because Dr. Bushida had been offered too bad a course. Ms. Prakush had attempted to contact Dr. Bushida. Dr. Bushida hadn't returned the calls, and consolidation hadn't agreed to a deposition. And while the ALJ could have ordered the deposition, which would have been within his discretion, it was also within his discretion to remand it and start over again with the preliminary evaluation, not with the claim. And he did so. Very simple. The next question, or really the last question in that case, is whether the operator has been deprived of due process. And it seems clear to us that he hasn't. Due process requires notice and the opportunity. And they had both. They were notified of the claim. They participated at every level. They developed evidence, including evidence from Drs. Ren and Fino, responding to Dr. Rasmussen's opinion. Well, what about the contention that their experts' opinions were based upon what Dr. Bushida had said, rather than what the later physicians had said? The Drs. Fino and Ren reviewed Dr. Rasmussen's opinion and responded to him in a deposition. And finally, the last thing there is that the consolidation raised a timeliness issue that simply is not present. The ALJ is charged with making sure that the preliminary evaluation is complete. The fact that Mr. Akoosh didn't challenge him for the district director is of no matter. The ALJ had his duty and he discharged it within his discretion. There are no more questions. Thank you. Mr. McDonough, thank you very much. Mr. Latimer. Let me simply clarify the record. Dr. Bushida wrote his opinion. It's at pages 1 through 4, August 2001. Administratively, the Office of Workers' Compensation Program said, Clarify your opinion. He wrote back November 2001. My client relied on that opinion. My client relied on his inability to diagnose pneumoconiosis. He said, It could be. I can't say. Now, the government says, That's okay. You can redevelop evidence at any time. There's a certain point when a party relies on evidence that they should be entitled to rely on that evidence. And that's what that argument that was just made overlooks. The case went up to the Office of Administrative Law Judges. Twenty days before the hearing, the record is supposed to be set. My client is looking at a claim that's going to be summarily denied. And now, I find myself in the Third Circuit, years later, arguing about whether or not the ALJ's decision is based on substantial evidence and consistent with law. Is the ALJ entitled to a decision one way or the other, rather than, I can't decide? No. I think, reasonably, a doctor can reach any of three conclusions. He has pneumoconiosis. The minor does not have pneumoconiosis. Or, based on information that I can discern from this minor in the testing, I can't tell you. I guess that's why it helps you. The petitioner has failed to meet his due at this point. Is that correct?  And, in the future, cases like this, I'm going to lose. Because minors with more than 15 years of employment are now going to get the presumption at 30 U.S.C. Section 921C4 that's been reenacted, where it switches the burden of proof on a minor to prove the existence of pneumoconiosis to the operator to disprove the existence. Well, isn't that a slight misrepresentation of what the ALJ said? The ALJ found, on the basis of the testimony of the doctors, without using the presumption, that the minor's exposure was a factor in developing COPD. He did rely on the doctors' opinions, but in response to the point that was made, I'm not asking this court to rewrite the evidence. I understand that it's not this court's responsibility or duty. It's the ALJ's job to do that. And I've pointed out numerous points where there's material conflicts in the physician testimony that the ALJ simply sidestepped. And that's why the conclusions on page 10A don't carry the day. You have to look back to what he did on those previous pages, and Judge Leland described the evidence. He just didn't get into the pits and resolve the real conflict as to the articles that Dr. Parker wanted to rely on to link part of this man's impairment to cholesterol exposure and the weaknesses in those articles. The other point the director brought up in their brief, they cited the Fourth Circuit's decision in U.S. Steel, and they said an opinion that's probable doesn't mean anything. Well, let's apply that same principle then to this case. And if we do, the opinions of Drs. Rasmussen and Dr. Selkin upon whom this ALJ relies also have to be thrown out. So let's adopt the director's position embracing that Fourth Circuit decision. And the Sixth Circuit has held similarly and commonly a decision recently issued this past spring that conclusory opinions simply don't help the trier of fact resolve the case, and that's what we have here. We've got doctors that offer us, in essence, differential diagnoses that it could be any one of these three different elements causing it, and that doesn't help the claimant prove their case. That's why ALJ Leland's decision is not based on substantial evidence, and that's why this case has to be remanded back for further consideration. Thank you for your time this morning. Thank you, Mr. Manley. Mr. Street, thank you very much. You hit the ground running very nicely. Thank you all. We'll take case under advisement. Very, very well-presented arguments.